FILED

OCT - 5 2021

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

1

2  Sarah Gossage, et al.

3  Steamer Landing Park

4  6 Copeland Park

5  Petaluma, CA 94952

6

7  PLAINTIFFS IN PRO PER

8                    UNITED STATES DISTRICT COURT

9                        NORTHERN CALIFORNIA

10  SARAH GOSSAGE, JANINE NARETTO,            Case No.: CV-21  80240-MISC.

11  MATTHEW ERICKSON, KAMONCHANOK

12  CHUMWANGWAPI, EUGENE REILLY

13  DRAKE, JOHNATHAN THOMAS, AND              *EX PARTE* APPLICATION FOR

14  OTHER SIMILARLY SITUATED RESIDING         TEMPORARY RESTRAINING

15  AT STEAMER LANDING PARK                   ORDER AND PRELIMINARY

16              Plaintiffs,                   INJUNCTION Pursuant to
                                              42 U.S.C. 1983

17              vs.

18                                            DEMAND FOR JURY TRIAL

19  CITY OF PETALUMA, CITY MANAGER

20  PEGGY FLYNN, MAYOR PRO TEM

21  TERESA BARRETT, CHIEF OF POLICE KEN

22  SAVANO, DIRECTOR OF PUBLIC WORKS

23  BRIAN COCHRANE, DOES 1-100,

24              Defendants.

25

26                        INTRODUCTION

27     1.     Steamer Landing Park is a public park in the City of Petaluma that

28  overlaps on three separate parcels. In the park exists a community of approximately twenty

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

1  individuals who have been sheltering in place at the encampment throughout the COVID-19

2  pandemic, herein referred to as "Steamer Landing Camp" or "the camp". The City of Petaluma

3  website describes the park as "one of Petaluma's hidden gems. Established as a public park in

4  1996, Steamer Landing is made up of 9.7 acres." The local newspaper, the Argus Courier

5  describes it as a "9.7-acre open space treasure". [Exhibit F] The long-standing camp at Steamer

6  Landing Park has become a community that supports and protects one another and has a true

7  communal feel.

8          2.      On Saturday, October 2nd, 2021, the City of Petaluma (the City) served

9  two notices (Notices) informing residents of the park that they have 72 hours to vacate their

10  homes at Steamer Landing Camp. The first notice was titled "72 Hours Notice to Vacate Illegal

11  Campsite & Debris Removal" and the second gave options of shelters to call. There is no time

12  written on the notice but 72 hours from the service of the Notices would mean the removal will

13  happen Wednesday, October 6, 2021. [Exhibit A]

14          3.      The camp consisting of around twenty different people has been in

15  existence for almost a year, and was most recently evicted in April 2021, when peoples tents,

16  food, water, and survival gear were destroyed by the City of Petaluma, with no one receiving

17  housing ahead of the sweep. [Exhibit B]

18          4.      When the City of Petaluma turned off water in the park the residents went

19  without water that they had used for cooking, cleaning, drinking, and bathing. On September

20  15th, 2021 campers from Steamer Landing had a protest to demand the water be turned back on

21  at the camp. https://www.petaluma360.com/article/news/petaluma-homeless-residents-activists-

22  protest-for-water-access-at-downtown/  [Exhibit C]

23          5.      On September 17th the water was restored to the camp after the City

24  improperly claimed that it had accidentally been shut off only a few weeks ago because of the

25  drought – though in fact it had been shut off for many months.

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

https://www.petaluma360.com/article/news/after-protest-petaluma-turns-water-back-on-near-homeless-encampment/  [Exhibit D]

      6.     On October 1st 2021, the city again shut off water to the park without explanation [Declaration of Sarah Gossage]

      7.     On October 2nd, the city gave notices to vacate to remove the camp at Steamer Landing off of the property within 72 hours. [Exhibit A]

      8.     In direct contradiction of Centers for Disease Control guidance against the dispersal of unhoused encampments, [Exhibit E] the City of Petaluma has continued to sweep camps. There have been at least two deaths in Sonoma County shelter Sam Jones which the city is referring people to as a shelter option in their 72 hour notices. [Exhibit A]

      9.     Accordingly, the named Plaintiffs file to prevent exposure to the deadly COVID-19 virus if they are dispersed and to prevent irreparable bodily harm ahead of the planned eviction.

      10. There is a lack of available shelter in the City of Petaluma. The local congregate shelter run by the Committee on the Shelterless (COTS) is Mary Isaak Center but there are not enough shelter beds available to house the homeless residents of the camp. No alternative housing options have been offered to the residents and the City does not currently have any other housing options such as sanctioned encampments, safe parking, pallet shelters or trailer sites. Though the City plans to build tiny homes in 2022, this will not address the plight of the residents in danger of being swept this week.

## MEMORANDUM OF POINTS AND AUTHORITIES

THE CHALLENGED CODE SECTIONS

      1.     Both of the Notices served by the City cite the exact same points of authority, even though one notice claims that the property owner – who has never communicated

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION



with the campers who have been residing been in open, adverse and conspicuous possession of

the property, some for close to a year. In both Notices, the cited authorities are:

                a.      Penal Code 602 (h); " through (o) – "willfully entering the

property of another"

                b.      Penal Code 647(e) " Any person who lodges in any

building, structure, vehicle, or place without permission of the owner or person

entitled to the possession or in control of it.

                c.      Petaluma Municipal Code 13.28.180 – No person shall

camp in City Parks except in designated places.

       2.      Importantly, both notices acknowledge that the property is a City of

Petaluma Park – including the notice to vacate on "private property" and cite Petaluma

Municipal Code as the basis for the planned removal.  Because it is a public park of the City of

Petaluma, and for all intents and purposes acts as fully accessible public property, the city cannot

discriminate against the survival needs of indigent persons who must use the park for the

purposes of shelter and for procuring food, water, services, and aid. Furthermore, the notice to

vacate cannot discriminate against people using the public park because their disabilities limit

them to being unable to enter congregate shelter. The rights of these individuals are protected

under Title II of the Americans with Disabilities Act (ADA).

       3.      If the private property owner(s) actually wishes to remove people living

on their property and has the authority to do so, then it is improper for the City to act as an agent

of said property owner(s) in initiating and facilitating the removal and disposal of the property

belonging to the camp residents.

      Furthermore, the threat of criminal charges flies in the face of precedent set by the

Ninth Circuit court in the landmark decision in Martin vs. Boise which prohibits the

criminalization of homelessness and states that "[S]o long as there is a greater number of

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id.* at 1048 n.8 (quoting Jones v. City of Los Angeles, 444 F.3d 1118, 1136 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)). Judge Berzon relied on the concurrence and dissent in *Powell* to conclude that involuntary conduct constituted status and could not be criminalized. *Id.* at 1047–48.

4.    Finally, the use Petaluma Municipal Code 13.28.010 is wholly inappropriate, simply because 13.28.010 because the City does not have a single practically accessible place for people to camp in the entire city, and in full force and effect prosecuting homeless individuals use of survival gear to aid in the involuntary sitting, lying, and sleeping in public.

## THE PARTIES

PLAINTIFFS

1.    Plaintiffs Matthew Erickson, Sarah Gossage, Janine Natello, Eugene Reilly Drake, and Kamonchanok Chumwangwapi are all current or recent residents of the camp at Steamer Landing Park.

2.    The Plaintiffs are representative of the residents of Steamer Landing Park camp.

DEFENDANTS

1.    Defendant City of Petaluma (herein "City") is a municipal corporation with Sonoma County existing under the laws of the State of California with capacity to sue and be sued. The Departments of the City include the Police Department and the Department of Public Works and Utilities. Defendant Teresa Barrett is Mayor Pro Tem of Petaluma. Defendant Peggy Flynn is the City Manager of Petaluma. Defendant Brian Cochrane is the Director of Public Works for the City of Petaluma. Defendant Ken Savano is the Chief of Police for the City of Petaluma

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

2.  The City, its employees and its agents participated in the unlawful conduct challenged herein, and to the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs. The acts complained of herein constitute policies, practices and customs of the City.

3.  If the sweep moves forward, the Petaluma Police Department and the Department of Public Works and Utilities will perform the sweep on October 6th.

**RELIEF SOUGHT**

Pursuant to Local Rule 65.1(a) plaintiffs move for a temporary restraining order against Defendants and each of them to halt the expulsion of homeless persons from Steamer Landing Park, where approximately 25 people have been camping for the past many months. Specifically, plaintiffs seek a Temporary Restraining Order and Preliminary Injunction against the Defendants criminalization of homelessness pursuant to Petaluma Municipal Code 13.28.010 and the misapplication of Penal Code 602 (h); " through (o) and Penal Code 647(e), and thereby preventing Defendants from removing Plaintiffs and all similarly situated persons, from Steamer Landing Park and other homeless encampments and essentially prohibiting them from camping anywhere in the City of Petaluma.

A TRO is necessary to prevent the irreparable harm to homeless Plaintiffs, prior to this Court having the opportunity to make a decision on Plaintiffs motion for preliminary injunction.

On October 2nd, 2021 officials of the City went to Steamer Landing and distributed handbills with excerpts from the above code sections and caused great consternation and fear in the camp.

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

As of October 5th, the City could at any time come into the camp, force residents into unsafe shelters where they will be exposed to COVID-19, violence, loss of privacy, and deterioration of their mental and physical wellbeing.

### Standard of Review

In considering an application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, courts in the Ninth Circuit look to the following factors: a) The movant has shown a likelihood of success on the merits; b) there is a likelihood that the movant will suffer irreparable harm in absence of a preliminary injunction c) the balance of equities tip in the movants favor; d) The injunction is in the public interest. *Stormance inc v. Selecky,* 586 F.3d 1109, 1127 (9th Cir. 2009). Also see *Idaho v Coeur d'Alene Tribe,* 794 F.3d 1039, 1046 (9th Cir, 2015) quing from *Pom Wonderful LLC v Hubbard,* 775 F.3d 1118,1124 (9th Cir.2014)

Under the sliding scale approach adopted by the Ninth Circuit in Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, Courts must weigh these factors using a "sliding scale" approach such that where there are "serious question going on the merits" a preliminary injunction may still be issued so long as "the balance of hardships tips sharply in the plaintiffs favor and the other two factors are satisfied" *Short v Brown,* 893 F.3d 671,675 (9th Cir.2018)(quoting *Alliance for the Wild Rockies v Cottrell,* 632 F.3d 1127, 1135 (9th Cur.2011) To determine whether to issue a TRO, the courts in the Ninth Circuit apply the same analysis used to evaluate a motion for preliminary injunction *McCarthy v Servis One, Inc.* 2017 U.S. Dist. LEXIS 32622 at 9-10(N.D. Cal. Mar. 7 2017)

Here, Plaintiffs *Ex Parte* Application for a Temporary Restraining Order and Preliminary Injunction, raises serious questions including the legality, under the Federal and California State Constitutions of Defendants plan to expel the homeless from Steamer Landing Park.

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

**Irreparable Harm**

2          The Plaintiffs and other residents of the camp will suffer irreparable harm if they are

3   made to move their homes on October 6th. They will have nowhere to go and will have to

4   wander around Petaluma in order to find a new place to put up their tents. This will expose them

5   to parts of the community potentially infected with COVID-19, whereas the current camp has

6   been a shelter from the wider community and has not had a COVID-19 infection run through it.

7          **State-Created Danger**

8          In addition, serious questions arise regarding **state-created danger by way of**

9   **increasing the risk of harm and even death faced routinely by homeless persons** deprived of

10   the relative safety of the encampment community and the material support rendered by charitable

11   organizations and individuals. When residents are in one place for an extended period of time

12   they feel more stable and are able to be healthier and feel more secure in a community such as

13   the camp here.

14

15          While most courts have held that there may be no fundamental right to housing,

16   the Ninth Circuit recognizes liability under substantive due process where a state or local official

17   act to place a person in a situation of known danger with deliberate indifference to their personal

18   or physical safety *Kennedy v City of Ridgefield.* 439 E 3d 1055 (9th Cit. 2006) "[D]elibrate

19   indifference is astringent standard of fault, requiring proof that a municipal actor disregard a

20   known or obvious consequence" *Board of County Com'rs of Bryan County, Okl v Brown,* 520

21   U.S. 397 "In examining whether [the city' affirmatively places an individual in danger, a court

22   does not look solely to the agency of the individual, nor does it rest its opinion on what options

23   may or may not have been available to the individual. Instead, [the court must] examine whether

24   [the city] left the person in a situation that was more dangerous than the one in which they found

25   him" *Kennedy,* 439, F3d at 1062 (citations omitted) See also, Northern District Judge Susan va

26   Keulen's  Order January 20, 2021 granting Plaintiffs Ex Parte Application for Preliminary

27

28

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  Injunction in the case of *Santa Cruz Homeless Union et al v Martin Bernal, City of Santa Cruz et*
2  *al Case No. 20-cv-09425-SVK*
3          Here, it is undisputed that there are no individual housing options available;
4  where the option provided to Steamer Landing and unhoused people in Petaluma is to wander the
5  streets where they are at risk for violence and theft, or enter into congregate shelters where
6  deaths from COVID 19 have already occurred. Resident's disabilities and individuals' needs are
7  not considered by the City and no action has been taken to ascertain these needs or disabilities
8  prior to or following the issuance of the Notices. Non-congregate shelter has not been offered to
9  residents of the camp and only COTS Mary Isaak Center has been offered as alternative
10  placement to the camp.
11
12                    **Balance of Equities**
13          The balance of equities tips sharply in the favor of the Plaintiffs. In a similar case
14  outcome for the recent decision in *Where Do We Go Berkeley v. California Department of*
15  *Transportation (Caltrans)* the Northern District of California's Judge Chen granted a TRO and
16  then granted in part the Plaintiff's preliminary injunction for six months. The order stopped
17  Caltrans from clearing an encampment in Emeryville, and compelled Caltrans to allow some of
18  its property to be accessible for unhoused people to have domiciles.
19          Here the public interest – which includes the interest of the homeless who it is often
20  forgotten are also members of the public – is clearly served by enjoining enforcement of the
21  upcoming displacement on October 6th.
22
23          **Even if the Court Should Not Find State-Created Danger, the Ninth Circuit's**
24  **ruling in Martin v. Boise, Alone, Prohibits Enforcement of Petaluma's Anti-Camping**
25                              **Ordinances**
26          In the above-cited ongoing case of Warren v. City of Chico, Chief Judge England
27  also cited to the Ninth Circuit's historic decision in Martin Vs City of Boise, 902 F. 3d 1031,
28

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1046 5 (9 Cir. 2018): "Because the ordinances passed by the [Chico] City Council subject individuals to 6 criminal penalties for ' living outdoors ' anywhere in the City, the result is that homeless individuals 7 are subject to criminal prosecution no matter where they go within the jurisdiction." England 8 9  continues: "This Circuit has previously held that ordinances such as this are unenforceable , unless there is practically available shelter within the City for all unhoused individuals. 'So long as there is are  greater number of homeless in a jurisdiction than the number of available beds [in shelters] the jurisdiction cannot prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public." (Quoting Jones v. City of Los Angeles, 444 F.3d 1 118, 1138 (9th Cir. 2006) 14

### FIRST CAUSE OF ACTION

**Cruel and Unusual Punishment; Excessive Fines (Eighth Amendment to the U.S. Constitution; 42 U.S.C. §1983; Art. 7) 173.**

Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein. The acts and omissions of Defendants, as described herein, violate the 28 constitutional rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment and excessive fines.

By virtue of their status as homeless people, and due to the insufficiency of shelter or housing in the City of Petaluma, the Plaintiffs have no way to comply with the laws Defendant enacted and continues to enforce against them. The City of Petaluma has a policy and practice of forcibly removing Plaintiffs who are involuntarily sleeping overnight from public property, including all parks, waterways, and city-owned properties which it has now codified in the amended Municipal Code Sections challenged herein. This has the effect of a citywide ban that does not allow for Plaintiffs to maintain life-sustaining activities that are the unavoidable consequence of being without housing.

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1    Defendants have a custom, policy, and/or practice of encouraging its officers to threaten
2    and to cite or arrest homeless people for sleeping or having property in public, which is
3    unavoidable behavior due to their unhoused status. There is an actual controversy between
4    Plaintiffs and the City of Petaluma concerning the continued threat of citation and arrest if
5    Plaintiffs remain on public property, in parks, waterways, and other city-owned properties. The
6    City will continue enforcement throughout the city and has a history of issuing citations and
7    making arrests in other areas of the city. Plaintiffs desire a judicial determination of their rights
8    and duties and a declaration as to Defendant's constitutional obligations.

9    ## SECOND CAUSE OF ACTION

**Cruel and Unusual Punishment (Art. 7, §17 California Constitution)**

12    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set
13    forth herein. The acts and omissions of Defendants, as described herein, violate the constitutional
14    rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment and
15    excessive fines. By virtue of their status as homeless people, and due to the insufficiency of
16    shelter or housing in the City of Petaluma, Plaintiffs have no way to comply with the laws
17    Defendant enacted and continues to enforce against them. The City of Petaluma has a policy and
18    practice of forcibly removing Plaintiffs who are involuntarily sleeping overnight from public
19    property, including all parks, waterways, and city- owned properties. This has the effect of a
20    citywide ban that does not allow for Plaintiffs to maintain life-sustaining activities that are the
21    unavoidable consequence of being without housing. Defendant has a custom, policy, and/or
22    practice of encouraging its officers to threaten and to cite or arrest homeless people for sleeping
23    or having property in public, which is unavoidable behavior due to their unhoused status. There
24    is an actual controversy between Plaintiffs and the City of Petaluma concerning the continued
25    threat of citation and arrest if Plaintiffs remain on public property, in parks, waterways, and other
26    city-owned properties. The City has made clear that it will continue enforcement throughout the

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

city and has a history of issuing citations and making arrests in other areas of the City. Plaintiffs

desire a judicial determination of their rights and duties and declaration as to Defendant's

constitutional obligations.

**THIRD CAUSE OF ACTION**

**Right to Due Process of Law: State-Created Danger (Fourteenth Amendments to the U.S.**

**Constitution; 42 U.S.C. § 1983)**

Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set

forth herein. The City of Petaluma has a policy and practice of forcibly removing Plaintiffs from

encampments in disregard of CDC guidelines pertaining to exposure to COVID-19 as well as

heat-related dangers that will be greatly exacerbated if Defendants are permitted to enforce the

revised sections of the Petaluma Municipal Code challenged herein. Plaintiffs will be placed in

immediate danger to their health and safety by exposing them to the elements, depriving them of

their rights to substantive due process guaranteed by the 14th Amendment to the U.S.

Constitution.

**FOURTH CAUSE OF ACTION**

**Right to Due Process of Law: State-Created Danger (Article I, Section 7 of the California**

**Constitution) 186.**

Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set

forth herein. The City of Petaluma has a policy and practice of forcibly removing Plaintiffs from

encampments in disregard of CDC guidelines pertaining to exposure to COVID-19 as well as

heat- related dangers that will be greatly exacerbated if Defendants are permitted to enforce the

revised sections of the Petaluma Municipal Code challenged herein. Plaintiffs will be placed in

immediate danger to their health and safety by exposing them to the elements, depriving them of

their rights to substantive due process guaranteed by Article 1, section 7 of the California

Constitution.

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

## FIFTH CAUSE OF ACTION

2  **Unlawful Seizure of Property (Fourth and Fourteenth Amendments to the U.S.**

3  **Constitution; 42 U.S.C. § 1983)**

4              Plaintiffs incorporate each and every allegation of the preceding paragraphs as if

5  fully set forth herein. The provisions of the challenged revisions to the Petaluma Municipal Code

6  will permit Defendants to permanently seize, and in some cases, destroy with no genuine

7  opportunity for retrieval, any personal property belonging to Plaintiffs and other unhoused,

8  unsheltered persons. On its face, and if enforced, the enacted prohibitions, policy and procedures

9  regarding camping unreasonable seizures that violate the 4th and 14th Amendments of the United

10  States Constitution.

11

12  ## SIXTH CAUSE OF ACTION

13  **Right to Due Process of Law (Fourteenth Amendment to the U.S. Constitution; 42 U.S.C.**

14  **§1983)**

15            Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set

16  herein. The City of Petaluma's Anti-Camping Ordinances and, in particular, the overbreadth,

17  vagueness essentially criminalizes homelessness across the city with justification. The over

18  broadness are a denial of due process of law, as guaranteed by the Fourteenth Amendment of the

19  United States Constitution, because they fail to inform Plaintiffs and other members of the public

20  as to what acts and conduct will subject them to criminal penalties and what forms of what acts

21  and conduct will not.

22

23  ## SEVENTH CAUSE OF ACTION

24  **Right to Due Process of Law (Article I, Section 7 of the California Constitution)**

25            Plaintiffs incorporate each and every allegation of the preceding paragraphs as if

26  fully set herein. The City of Petaluma's Anti-Camping Ordinances and, in particular , the

27  overbreadth, vagueness and ambiguity of terms including , but not limited to  "critical

28

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

13

infrastructure" "damage," "incapacity," "disruption," "destruction," "impede" "vital function" "youth-related" in the challenged Code Sections create vague and uncertain requirements that are a denial of due process of law, as guaranteed by the Article I, Section 7 of the California State Constitution, because they fail to inform Plaintiffs and other members of the public as to what acts and conduct will subject them to criminal penalties and what forms of what acts and conduct will not.

## EIGHTH CAUSE OF ACTION

**Violation of California Civil Code §52.1195.**

Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein. The Defendant's conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the State of California. Defendant has enacted revisions to its municipal code which on their face and if enforced will subject Plaintiffs to arrest and prosecution for violation of misdemeanors punishable by incarceration and excessive fines under ordinances unconstitutional on their face and as applied. 1o  If forced to comply, Plaintiffs face coercive and intimidating tactics to forcibly remove Plaintiffs, present them with obviously dangerous restrictions for involuntarily sleeping outdoors, and by Petaluma municipal code 13.28.080.28 literally banning daytime camping and severely restricting overnight camping in every inch of the City, ultimately push them out of Defendant's jurisdiction. Plaintiffs are entitled to an injunction pursuant to California Civil Code §52.1.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

14

1

(a)     Grant a Temporary Restraining Order, Preliminary Injunction or

2  Permanent Injunction immediately enjoining Defendants and each of them from closing Steamer

3  Landing Park to camping by unhoused individuals or otherwise removing and subjecting

4  unhoused people to Petaluma Municipal Code 13.28.180 portion of the Petaluma Municipal

5  Code which is intended to or will have the effect of removing persons from Steamer Landing

6  unless and until each person/family so removed is actually provided- in real-time - with safe,

7  indoor individual housing, consistent with CDC guidance and Ninth Circuit' s decision in *Martin*

8  *v. Boise*;

9

(b)     For a temporary restraining order, a preliminary injunction, and a

10  permanent injunction, enjoining and restraining Defendants from citing or arresting individuals

11

12  for violation of the City's anti-camping ordinance.

13

(c)     For a temporary restraining order, preliminary and permanent injunction,

14  enjoining and restraining Defendants City of Santa Rosa and CDC from seizing and disposing of

15  individuals' property in violation of their Fourth and Fourteenth amendment rights.

16

(d)     Grant a temporary restraining order, preliminary injunction or permanent

17  injunction immediately enjoining Defendants and each of them from enforcing Sections 7-11,

18

19  Petaluma Municipal 13.28.180 and other sections of Petaluma Municipal Code

20  that have the stated purpose of or will result in the criminalization of the homeless in violation of

21  their above-cited state and federal rights and statutory protections and under the ruling of the

22  Ninth Circuit Court of Appeals in *Martin v. Boise;*

23

(c)     Order Defendants to strictly observe COVID-19, heat-related and other

24  federal CDC,

25     California Department of Health and Marin County Public Health guidance and

26  orders regarding homeless encampments;

27

(d)     That this Court retain jurisdiction in this matter;

28

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

13

(e)     That the court order the city return water access to Steamer Landing Park;

(f)     For declaratory judgment that Defendant's policies, practices, and conduct as alleged herein violate Plaintiff's' rights under the United States Constitution.

(g) Award any further relief the Court deems appropriate.

Dated: October 5, 2021

_____
PLAINTIFF IN PRO PER

_____
PLAINTIFF IN PRO PER

_____
PLAINTIFF IN PRO PER

_____
PLAINTIFF IN PRO PER

_____
PLAINTIFF IN PRO PER

_____
PLAINTIFF IN PRO PER

EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# EXHIBIT A



# 72 Hours Notice to Vacate Illegal Campsite & Debris Removal

## BY ORDER OF THE PETALUMA POLICE DEPARTMENT

Penal Code 602(b) thru (o) - willfully entering or remaining on the property of another
Penal Code 647(e) -- Any person who lodges in any building, structure, vehicle or place, whether public or private, without the permission of the owner or person entitled
to the possession or in control of it.
Petaluma Municipal Code 13.28.180 -- No person shall camp in City Parks except in designated places.

**YOU HAVE 72 HOURS TO CLEANUP YOUR PROPERTY AND VACATE THE AREA OR YOU MAY BE
ARRESTED AND YOUR PROPERTY WILL BE SEIZED**

POSTING DATE: 10/7/2021     OFFICER: _____

LOCATION: Steamer Landing     EVENT or CASE NUMBER: _____

All non-permanent, personal property and debris are to be removed by:

Any personal property left at the site after this date will be considered abandoned and will be handled in accordance with PPD Policy.
Any personal property not disposed of will be stored for Ninety Days (90) without charge. After Ninety Days (90) days, unclaimed property will be disposed.

The City of Petaluma will make a reasonable effort to identify all personal property left at the site but, City Staff will not open backpacks, boxes, and bags because of
health and safety concerns. If personal items are left in plain view, the City of Petaluma will collect these items and store them for safe keeping for a period of not more
than ninety (90) days. Food, perishables, and soiled, wet or moldy bedding materials will not be stored due to health and safety reasons. Individuals wishing to
reclaim personal property may contact the Property Unit at the Petaluma Police Department, 969 Petaluma Blvd North or call 707-778-4328 to schedule a date and
time to claim their property.

## HOMELESS OUTREACH SERVICES:
COTS Mary Isaak Center-900 Hopper Street, Petaluma 707-765-6530
Sonoma Co. Housing & Shelter Services Coordinated Entry Managed by Catholic Charities 866-542-5480
Salvation Army Petaluma 721 S. McDowell Blvd, 707-769-0716
Catholic Charities Homeless Services Center 600 Morgan Street, Santa Rosa 707-525-0226
Sam Jones Hall 4020 Finley Avenue, Santa Rosa, 707-523-3900



# ATTENTION!!!
# YOU ARE TRESPASSING ON PRIVATE PROPERTY

The Property Owners have _____ the Police Department that they want all subjects trespassing on their property to leave per the following:

Penal Code 602(h) thru (o) – wilfully entering or remaining on the property of another
Penal Code 647(e) – Any person who lodges in any building, structure, vehicle or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it
Petaluma Municipal Code 13.29.180 – No person shall camp in City Parks except in designated places.

If you need assistance please contact one of COTS outreach workers or visit the Mary Isaak Center

## HOMELESS OUTREACH SERVICES:
COTS Mary Isaak Center-900 Hopper Street, Petaluma 707-765-6530
Sonoma Co. Housing & Shelter Services Coordinated Entry Managed by Catholic Charities 866-542-5480
Salvation Army Petaluma 721 S. McDowell Blvd, 707-769-0716
Catholic Charities Homeless Services Center 600 Morgan Street, Santa Rosa 707-525-0226
Sam Jones Hall 4020 Finley Avenue, Santa Rosa, 707-523-3900

# EXHIBIT B

News    Obits    Sports    Business    Opinion    Food & Wine    Lifestyle    A&E    Events Guide

Search...    🔍    Subscribe

# Homeless encampment near Petaluma's Steamer Landing Park cleared



**SLIDE 1 OF 21**

The Petaluma Police Department swept a homeless encampment near Steamer Landing Park on Friday, April 30, 2021. Worrying about where they will go next, Sarah Gossage cries in the tent she and her boyfriend, Mark van derVen, set up next to the Petaluma River. She was upset because she thought she would be given more notice of the sweep because she said she has a plan to move and get a job soon. (CRISSY PASCUAL/ARGUS-COURIER STAFF)

 

**TYLER SILVY**
ARGUS-COURIER EDITOR
April 30, 2021

More than a dozen residents who had been living for weeks near Petaluma's Steamer Landing Park were rousted from the encampment Friday morning as a city-operated front end loader and excavator cleared campsites.

Petaluma Police gave notice of the camp clearance earlier this week, and stood by as residents and activists, shouting the occasional coarse epithet, scrambled to gather belongings.

The move to clear the encampment from Lind Marine property between Steamer Landing Park and the SMART train tracks to the east came after dozens of police visits to the patch of property in the past six months, Petaluma Police Lt. Tim Lyons said.

"We've responded to 151 calls for service here in six months – just this area right here," Lyons said. "We're getting complaints from all of the businesses over there have called and complained."

As many as three dozen residents occupied the encampment near the Petaluma River at any one point, making it one of the larger unsanctioned camps within city limits. Those who remained Friday, including activists and representatives from Petaluma's Porchlight Coalition, Marin County's Tam Equity Campaign and the California Homeless Union lamented police tactics.

"All of these people are going to be on this street in an hour," said Jennifer Restivo, a Petaluma activist, pointing to Hopper Street. "What are we doing to help them? It's a disgrace."

**DAILY HEADLINES**
DAILY

Subscribe to the Press Democrat's Daily Newsletter.

Enter your email address

Subscribe Now

**Read our Privacy Policy**

In its 72-hour notice provided to residents Monday, police offered a number of resources, including the Committee on the Shelterless' nearby Mary Isaak Center, which had 33 beds available Friday morning. By the time police began enforcing the exodus, the camp's numbers had dwindled to about 15, Lyons said.

COTS CEO Chuck Fernandez, who was present at Friday's sweep along with outreach staff, said Mary Isaak Center staffers had been at the encampment every day this week working to bring people into the shelter.

"That's their job," said Fernandez. "It takes such a long time to build trust. You have to be consistent and follow up."

By mid-morning Friday, as tent spaces and debris dwindled amid the efforts of city crews, a sign lay propped against a lone tree, posing a simple question.

"Where do we go?"

Melody Thornton, 56, said she had talked to COTS staffers earlier in the w
there. She said she didn't have anywhere to put her stuff though, and was
solutions.

"It's the end of the month, and I don't have a lot of money," Thornton said.

Other residents, wary of the congregate living conditions at the Mary Isaa
them with nowhere to go.

Fernandez acknowledged rules at the COTS-operated shelter on Hopper Street often irritate residents used to operating, and living, on their own terms.

"The reality is that in congregate living, you have to maintain safety all the time," Fernandez said. "A lot people don't like the guidelines we have."

Sarah Gossage, a Petaluma native, had lived at the Steamer Landing encampment for several weeks with boyfriend Mark van derVen and dog Mary Jane since being booted from a previous spot on McNear Peninsula.

On Friday, Gossage switched between happy chatter while serving coffee from a hot plate near her tent and tears as she recounted the circumstances that led to a life on the streets, as well as her efforts to get more time to leave her riverside campsite.

"The officers told me they were going to work with me," she said while sharing her concerns about Mary Isaak Center routines. "In eight days, I'm going to get my check, and I'm going to buy a van and I'm going to go to Tahoe."

*Tyler Silvy is editor of the Petaluma Argus-Courier. Reach him at tyler.silvy@arguscourier.com, 707-776-8458, or @tylersilvy on Twitter.*

MOST POPULAR

1

2

3

Sheriff's Office destroyed video of Petaluma man's jail suicide, family alleges

Lowell Sheldon out as co-owner of Handline restaurant after sex assault claim

Motorcyclist on group ride dies of injuries suffered in weekend Hwy. 1 crash

4

5

6

Here's what medical experts and ethicists say about healthy people getting COVID-19 booster shots

1st lifeguard on scene of shark attack off Sonoma Coast describes rescue

Sponsored Content on Press Dem

## Earn $200 After Spending $500 [⧉]

*By Wise Bread*

$200 bonus offer. High ongoing cash back rates. No annual fee. 0% interest for 15 months on purchases. Start racking...

# EXHIBIT C

# Petaluma homeless residents, activists protest for water access at downtown park



**SLIDE 1 OF 10**

A handful of homeless residents and advocates gathered to protest the lack of access to water for the people living in tents at Steamer Landing Park in downtown Petaluma. Nok Chum, left, holds a sign while Eddie Campagnola calls out to honking cars driving by on the corner of D Street and Lakeville on Wednesday, Sept. 15, 2021. (CRISSY PASCUAL/ARGUS-COURIER STAFF).



**AMELIA PARREIRA**
ARGUS-COURIER STAFF

September 15, 2021

*Update: The city has restored water access at the site. To read more, <u>click here</u>.*

Calling it a matter of health, hygiene and safety, homeless residents and activists hosted a protest Wednesday, demanding access to fresh water after they say a city-owned spigot near a downtown Petaluma encampment was shut down.

The event started about noon Wednesday at the encampment located near Steamer Landing, before protesters, equipped with hand-painted signs, marched to the corner of D and Lakeville streets to engage with passing motorists.



The protest comes months after activists say water access was shuttered at the popular encampment site near the Lind Marine building at 300 D St.

Petaluma City Manager Peggy Flynn said city staff is looking into the complaint. It was not immediately clear whether the tap was controlled by the city, or was privately owned. But one spigot is attached to a post bearing city of Petaluma signage.

Jason Sarris, who heads the Novato chapter of the California Homeless Union, said he found out the spigot had been shuttered two weeks ago while hosting a barbecue for the residents at the site, which is dotted with at least 20 tents. He said lack of access to water is a matter of health and safety.

## DAILY HEADLINES
DAILY

Subscribe to the Press Democrat's Daily Newsletter.

Enter your email address

Subscribe Now

**Read our Privacy Policy**

"We all need water to sustain life," said Sarris, who joined other activists in handing out water bottles at the encampment. "But as a safety precaution, I think there should be water here because of fire safety."

Some residents at the encampment also relied on that water for bathing purposes. Sarah Gossage said she wound up in Petaluma after the houseboat she previously lived on was stolen, right when the COVID-19 pandemic hit.

"Normally homeless people have a gym membership so they can take showers. But when COVID hit, they shut down everything at the gyms," said Gossage. "I was livid, so I bought a garden hose and a sprayer, and I said, 'The first spigot I find, I don't care, I'm just going to hook up to it and take a shower.' And that was the first spigot that I found."

Gossage said that, at that po                    s, adding that the Steamer
Landing spigot became "inva

"So then we stayed here and                    e whenever they wanted,"
Gossage said. "In the summe                    .        ter time it's not that great."

Gossage said that showers are usually available on Fridays at the Mary Isaak center, where residents are allowed a 10-minute slot.

"One shower a week is four showers a month," she said. "How are we supposed to get a job or go to a job interview, or maintain a job? We're really grateful for what we do have, but in the same breadth it's not conducive to trying to get on our feet."

Gossage and others called on city leaders to act to restore access to fresh, running water.

"It's inhumane and it's disheartening," Gossage said. "People look at you because you're homeless and treat you differently because you're homeless. It's hard on our souls."

*Amelia Parreira is a staff writer for the Argus Courier. She can be reached at amelia.parreira@arguscourier.com or 707-521-5208.*

MOST POPULAR

1                                  2                                  3

Lowell Sheldon out as co-          Sheriff's Office destroyed video    Motorcyclist on group ride
owner of Handline restaurant       of man's jail suicide, Petaluma     dies of injuries suffered in
after sex assault claim            family alleges                      weekend Hwy. 1 crash

4                                  5                                  6

# EXHIBIT D

News    Opinion    Obits    Sports    Schools    A&E    Dining    Events Guide    Blogs

Search...                                                                    🔍        Subscribe

## After protest, Petaluma turns water back on near homeless encampment



**SLIDE 1 OF 4**

The homeless camp along the Petaluma River at Steamer Landing Park on Wednesday, Sept. 15, 2021. Petaluma has restored water access for a Steamer Landing homeless encampment after residents and activists protested the shutoff this week. (CRISSY PASCUAL/ARGUS-COURIER STAFF).



**TYLER SILVY**
ARGUS-COURIER EDITOR
September 17, 2021

Petaluma has restored water access for a Steamer Landing homeless encampment after residents and activists protested the shutoff this week, City Manager Peggy Flynn confirmed Friday.

Calling it a matter of health, hygiene and safety, homeless residents and activists hosted a protest Wednesday, demanding access to fresh water after they say a city-owned spigot near a downtown Petaluma encampment was shut down.

The event started about noon Wednesday at the encampment located near Steamer Landing, before protesters, equipped with hand-painted signs, marched to the corner of D and Lakeville streets to engage with passing motorists.

In an email Friday, Flynn said the water was mistakenly cut off when park staff shuttered nearby irrigation operations in response to the drought.

"Staff immediately addressed (the matter), and one of the spigots remains turned off until it can be repaired for leaks. The other is now operational," Flynn said. "Note that both, while potable, are not meant to be used for drinking water."

Some residents who spoke to the Argus-Courier on Wednesday say they used the city water for bathing purposes.

## DAILY HEADLINES
DAILY

The Petaluma Argus-Courier's Daily Newsletter.

Enter your email address

Subscribe Now

**Read our** Privacy Policy

RELATED STORIES

Homeless residents, activists protest for water access at Steamer Landing

Jason Sarris, who heads the Novato chapter of the California Homeless Union, said lack of access to water is a matter of health and safety.

"We all need water to sustain life," Sarris said Wednesday, while joining other activists in handing out water bottles at the encampment, home to more than 20 tents. "But as a safety precaution, I think there should be water here because of fire safety."

Tyler Silvy is editor of the Petaluma Argus-Courier. Reach him at tyler.silvy@arguscourier.com, 707-776-8458, or @tylersilvy on Twitter.

MOST POPULAR

1

We know they're out there' Fellow surfers recount shark attack off Sonoma Coast

2

Steamer Landing encampment residents brace for eviction next week

3

A rough night for Gaucho football

4

New Netflix film is terrifying, even on a bright sunny day, says local critic

5

Padecky: John Porchivina's long journey to maturity, on and off the football field

6

Doing 'the Twist' while Petaluma argued about parking, and the world teetered on the brink

Sponsored Content on petaluma360



### Fun In Retirement? How To Finalize A Retirement Plan That Includes Fun

*By TD Ameritrade*

The COVID-19 pandemic upended life for most of us; that much is a given. But for those in or nearing retirement, it...

Trending Articles

ADVERTISEMENT

# EXHIBIT E

 Centers for Disease Control and Prevention



To maximize protection from the Delta variant and prevent possibly spreading it to others, get vaccinated as soon as you can and wear a mask indoors in public if you are in an area of substantial or high transmission.

# Interim Guidance on People Experiencing Unsheltered Homelessness

Interim Guidance

Updated July 8, 2021        Print

This interim guidance is based on what is currently known about coronavirus disease 2019 (COVID-19). The Centers for Disease Control and Prevention (CDC) will update this interim guidance as needed and as additional information becomes available.

## Summary of Recent Changes

### Updates as of July 7, 2021                                                              ∧

- Added information on vaccination for people experiencing unsheltered homelessness
- Updated considerations based on vaccination status

View previous updates

People experiencing unsheltered homelessness (those sleeping outside or in places not meant for human habitation) may be at risk for infection when there is community spread of COVID-19. This interim guidance is intended to support response to COVID-19 by local and state health departments, homelessness service systems, housing authorities, emergency planners, healthcare facilities, and homeless outreach services. Homeless shelters and other facilities should also refer to the Interim Guidance for Homeless Shelters.

COVID-19 is caused by a coronavirus. Vaccination is the leading prevention measure to keep clients, outreach staff, and volunteers from getting sick with COVID-19. COVID-19 vaccines are safe and effective and are available at no cost to everyone 12 years and older living in the United States, regardless of insurance or immigration status. Learn more about the Benefits of Getting a COVID-19 Vaccine. See Interim Guidance for Health Departments: COVID-19 Vaccination Implementation for People Experiencing Homelessness for more information. In encampments or other unsheltered locations, individuals who are fully vaccinated should follow CDC's Recommendations for Fully Vaccinated People.

Lack of housing contributes to poor physical and mental health outcomes, and linkages to permanent housing for people experiencing homelessness should continue to be a priority. In the context of COVID-19 spread and transmission, the risks associated with sleeping outdoors or in an encampment setting are different than from staying indoors in a congregate

COVID-19

risks should be considered for each individual experiencing unsheltered homelessness.

# Community coalition–based COVID-19 prevention and response

Planning and response to COVID-19 transmission among people experiencing homelessness requires a "whole community" ⧉ approach, which means involving partners in the response plan development, with clearly outlined roles and responsibilities. Table 1 outlines some of the activities and key partners to consider for a whole-community approach.

Table 1: Using a whole-community approach to prepare for COVID-19 among people experiencing homelessness

---

**Connect to community-wide planning**

Connect with key partners to make sure that you can all easily communicate with each other while preparing for and responding to cases. A community coalition focused on COVID-19 planning and response should include:

- Local and state health departments
- Outreach teams and street medicine providers
- Homeless service providers and Continuum of Care leadership
- Emergency management
- Law enforcement
- Healthcare providers
- Housing authorities
- Local government leadership
- Other support services like case management, emergency food programs, syringe service programs, and behavioral health support
- People with lived experiences of homelessness

People with lived experiences of homelessness can help with planning and response. These individuals can serve as peer navigators to strengthen outreach and engagement efforts. Develop an advisory board with representation from people with current or former experiences of homelessness to ensure community plans are effective.

**Identify additional sites and resources**

Continuing homeless services during community spread of COVID-19 is critical. Make plans to maintain services for all people experiencing unsheltered homelessness. Furthermore, clients who are positive for COVID-19 or exposed to someone with COVID-19 need to have access to services and a safe place to stay, separated from others who are not infected. To facilitate the continuation of services, community coalitions should identify resources to support people sleeping outside as well as additional temporary housing, including sites with individual rooms that are able to provide appropriate services, supplies, and staffing. Temporary housing sites should include:

- Overflow sites to accommodate shelter decompression and higher shelter demands
- Isolation sites for people who are confirmed to be positive for COVID-19 by laboratory testing
- Quarantine sites for people who are awaiting testing, awaiting test results, or who were exposed to COVID-19
- Protective housing for people who are at increased risk for severe illness from COVID-19

Depending on resources and staff availability, housing options that have individual rooms (such as hotels/motels) and separate bathrooms should be considered for the overflow, quarantine, and protective housing sites. In addition, plan for how to connect clients to housing opportunities after they have completed their stay in these temporary sites.

---

# Communication

Outreach workers and other community partners, such as emergency food provision programs or law enforcement, can help ensure people sleeping outside have access to updated information about COVID-19 and access to services.

- Stay updated on the local level of transmission of COVID-19.
- Build on existing partnerships with peer navigators who can help communicate with others.
- Maintain up-to-date contact information and areas frequented for each client.
- Communicate clearly with people sleeping outside.
  - Use health messages and materials developed by credible public health sources, such as your local and state public health departments or the Centers for Disease Control and Prevention (CDC).
  - Post signs in strategic places (e.g., near handwashing facilities) providing information on vaccination, social distancing 🄿 , handwashing, and cough etiquette 🄿 .
  - Provide educational materials about COVID-19 for everyone, including people with limited English proficiency, people with intellectual or developmental disabilities, and people with hearing or vision impairments.
  - Ensure communication with clients about changes in homeless services policies and/or changes in physical location of services such as food, water, hygiene facilities, regular healthcare, and behavioral health resources.
- Identify and address potential language, cultural, and disability barriers associated with communicating COVID-19 information to workers, volunteers, and those you serve. Learn more about reaching people of diverse languages and cultures.

## Considerations for outreach staff and volunteers

*Staff and volunteer training and policies*

- Provide training 🄿 and educational materials related to COVID-19 for staff and volunteers.
- Minimize the number of staff members who are not fully vaccinated who have face-to-face interactions with clients.
- Develop and use contingency plans for increased absenteeism caused by employee illness or by illness in employees' family members. These plans might include extending hours, cross-training current employees, or hiring temporary employees.
- Prepare to support case investigation and contact tracing activities in collaboration with local health departments.
- Regardless of vaccination status, assign outreach staff and volunteers who are at increased risk for severe illness from COVID-19 to duties that do not require them to interact with clients in person.
- Outreach staff and volunteers should review stress and coping resources for themselves and their clients during this time.

*Staff and volunteer prevention measures*

- Encourage outreach staff and volunteers to get vaccinated as soon as they can.
- Advise staff who are not fully vaccinated to maintain 6 feet of distance while interacting with clients, staff and volunteers, where possible.
- Require outreach staff who are not fully vaccinated to wear masks when working in public settings or interacting with clients. They should still maintain a distance of 6 feet from each other and clients, even while wearing masks.
- Encourage outreach staff, regardless of vaccination status, to maintain good hand hygiene by washing hands with soap and water for at least 20 seconds or using hand sanitizer (with at least 60% alcohol) on a regular basis, including before and after each client interaction.
- Advise outreach staff, regardless of vaccination status, to avoid handling client belongings. If staff are handling client belongings, they should use disposable gloves, if available. Make sure to train any staff using gloves to ensure proper use and ensure they perform hand hygiene before and after use. If gloves are unavailable, staff should perform hand hygiene immediately after handling client belongings.
- Outreach staff who are checking client temperatures should use a system that creates a physical barrier between the client and the screener.
  - Where possible, screeners should remain behind a physical barrier, such as a glass or plastic window or partition (e.g., a car window), that can protect the staff member's face from respiratory droplets that may be produced if the client sneezes, coughs, or talks.

- If physical distancing or barrier/partition controls cannot be put in place during screening, personal protective equipment (PPE, e.g., facemask, eye protection [goggles or disposable face shield that fully covers the front and sides of the face], and a single pair of disposable gloves) can be used when within 6 feet of a client.

- For street medicine or other healthcare professionals, regardless of vaccination status, who are caring for clients with suspected or confirmed COVID-19 should follow Infection Prevention and Control Recommendations for Healthcare Personnel During the COVID-19 Pandemic.

- Outreach staff, regardless of vaccination status, who do not interact closely (e.g., within 6 feet) with sick clients and do not clean client environments do not need to wear PPE.

- Outreach staff, regardless of vaccination status, should launder work uniforms or clothes after use using the warmest appropriate water setting for the items and dry items completely.

*Staff process for outreach*

- In the process of conducting outreach, staff should
  - Greet clients from a distance of 6 feet (for staff who are not fully vaccinated) and explain that you are taking additional precautions to protect yourself and the client from COVID-19.
  - Wear a mask if not fully vaccinated.
  - Provide the client with a mask if they are not fully vaccinated or have unknown vaccination status.
  - Screen clients for symptoms by asking them if they feel as if they have a fever, cough, or other symptoms consistent with COVID-19.
    - Children have similar symptoms to adults and generally have mild illness.
    - Older adults and people with underlying medical conditions may have delayed presentation of fever and respiratory symptoms.
    - If medical attention is necessary, use standard outreach protocols to facilitate access to healthcare.
  - Continue conversations and provision of information while maintaining 6 feet of distance (for staff who are not fully vaccinated).
  - If at any point you do not feel that you are able to protect yourself or your client from the spread of COVID-19, discontinue the interaction and notify your supervisor.

# Considerations for assisting people experiencing unsheltered homelessness

*Help clients from becoming sick with COVID-19*

- Recommend strongly that clients get a COVID-19 vaccine. Be prepared to address common questions about COVID-19 vaccination.
- Those who are experiencing unsheltered homelessness face several risks to their health and safety. Consider the balance of these risks when addressing options for decreasing COVID-19 spread.
- Continue linkage to homeless services, housing, medical, mental health, syringe services, and substance use treatment, including provision of medications for opioid use disorder (e.g., buprenorphine, methadone maintenance, etc.). Use telemedicine, when possible.
- Some people who are experiencing unsheltered homelessness may be at increased risk of severe illness from COVID-19 due to older age or certain underlying medical conditions, such as chronic lung disease or serious heart conditions.
  - Reach out to these clients regularly to ensure they are linked to care as necessary.
  - Prioritize providing individual rooms for these clients, where available.
  - Recommend that all clients who are not fully vaccinated (or have unknown vaccination status) wear masks any time they are around other people. Masks should not be placed on young children under age 2, anyone who has trouble breathing, or is unconscious, incapacitated, or otherwise unable to remove the mask without assistance.
- Provide clients with hygiene materials, where available.
- Discourage clients who are not fully vaccinated (or have unknown vaccination status) from spending time in crowded places or gathering in large groups, for example at locations where food, water, or hygiene supplies are being distributed.

*Help link sick clients to medical care*

- Regularly assess clients for symptoms.
  - Provide anyone who presents with symptoms with a mask.
  - Clients who have symptoms may or may not have COVID-19. Make sure they have a place they can safely isolate in coordination with local health authorities.
  - If available, a nurse or other clinical staff can help with clinical assessments. These clinical staff should follow personal protective measures.
  - Facilitate access to non-urgent medical care as needed.
  - Use standard outreach procedures to determine whether a client needs immediate medical attention. Emergency signs include **but are not limited to:**
    - Trouble breathing
    - Persistent pain or pressure in the chest
    - New confusion or inability to arouse
    - Pale, gray, or blue-colored skin, lips, or nail beds, depending on skin tone
  - Please refer clients for medical care for any other symptoms that are severe or concerning to you.
  - Notify the designated medical facility and transporting personnel that clients might have COVID-19.
- If a client has tested positive for COVID-19
  - Use standard outreach procedures to determine whether a client needs immediate medical attention.
  - If immediate medical attention is not required, facilitate transportation to an isolation site.
  - Notify the designated medical facility and transporting personnel that clients might have COVID-19.
  - If medical care is not necessary, and if no other isolation options are available, advise the individual on how to isolate themselves while efforts are underway to provide additional support.
  - Coordinate with the local health department and provide locating information for case investigation and contact tracing
  - During isolation, ensure continuation of behavioral health support for people with substance use or mental health disorders.
  - In some situations, for example due to severe untreated mental illness, an individual may not be able to comply with isolation recommendations. In these cases, community leaders should consult local health authorities to determine alternative options.
  - Ensure the client has a safe location to recuperate (e.g., respite care) after isolation requirements are completed, and follow-up to ensure medium- and long-term medical needs are met.

# Considerations for encampments

- If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are.
  - Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.
- Encourage people staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual.
  - If an encampment is not able to provide sufficient space for each person, allow people to remain where they are but help decompress the encampment by linking those at increased risk for severe illness to individual rooms or safe shelter.
- Work together with other community organizations and offices to improve sanitation in encampments.
- Ensure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day.
- If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol).

# Considerations for a Long–Term Infection Prevention Strategy for People Experiencing Unsheltered Homelessness

When community COVID-19 transmission levels change, some communities might consider when to modify the COVID-19 prevention measures described above. Below are several factors to consider before modifying community-level COVID-19 prevention approaches for people experiencing unsheltered homelessness, for example, changing outreach team procedures or approaches to COVID-19 prevention in encampments. These factors should be considered together; no single factor should be used alone to decide changes in approach.

These factors should be discussed with local public health partners, community homeless service providers, and people with lived experience of homelessness. Any modifications to COVID-19 prevention measures should be conducted in a phased and flexible approach, with careful monitoring of COVID-19 cases in the community. Connecting people experiencing homelessness to permanent stable housing should continue to be the primary goal.

**Community Transmission Levels**: *What is the incidence of COVID-19 in the community?*

The incidence of COVID-19 in the community will influence the risk of infection for people experiencing unsheltered homelessness. The CDC COVID Data Tracker has a tool that displays the current level of community transmission at the county level. Increasing COVID-19 vaccination coverage in the surrounding community is important to help reduce community transmission, but community vaccination coverage should not be used alone to decide to modify approaches to prevention among people experiencing unsheltered homelessness.

**Vaccination Levels:** *What proportion of people experiencing unsheltered homelessness in the community have been vaccinated against COVID-19?*

Vaccination significantly decreases the likelihood of becoming infected with the virus that causes COVID-19. Refer to the Interim Public Health Recommendations for Fully Vaccinated People for the most up-to-date information on individual-level modifications to prevention measures for people who are fully vaccinated. People experiencing unsheltered homelessness who are fully vaccinated do not need to wear masks unless they are accessing services in a homeless service facility. Although we know vaccines help protect individuals, there is not enough information available yet to determine a level of vaccination coverage needed to modify community-level COVID-19 prevention measures. Note: Vaccination status should not be a barrier to accessing homeless services. COVID-19 vaccinations should not be mandatory to receive homeless services unless required by state or local health authorities.

**Availability of Housing:** *What is the housing availability in the community?*

Any modifications to approaches to encampments or people experiencing unsheltered homelessness should be conducted with an awareness of housing availability and homeless service capacity. Closing encampments can lead people to disperse and result in increased crowding at other encampments or in shelters, which can increase the risk of spreading infectious disease, including COVID-19. Encampment disbursement should only be conducted as part of a plan to rehouse people living in encampments, developed in coordination with local homeless service providers and public health partners.

Even if the community decides to modify some infection prevention measures for people experiencing unsheltered homelessness, continue to maintain the following key components of a sustainable approach to disease prevention and response.

1. Monitor community transmission of COVID-19 in the area. For the latest updates on county-level transmission of the virus that causes COVID-19, use this CDC COVID Data Tracker tool.
2. Create flexible quarantine and isolation locations that are scalable, in case the number of COVID-19 cases in the community increases.
3. Keep a minimum set of public health prevention and control procedures in place at all times, including
   a. Working together with community organizations to improve sanitation in encampments.
   b. Ensuring access to handwashing facilities and supplies.
   c. Providing place-based, regular health evaluations and linkages to medical care, including access to COVID-19 vaccination, routine vaccinations, and behavioral health services.

More Information

Considerations for food pantries and food distribution sites

Visit cdc.gov/COVID19 for the latest information and resources

Information for health departments

Guidance for homeless service providers

COVID-19 fact sheets for people experiencing homelessness (at the bottom of the page)

Department of Housing and Urban Development (HUD) COVID-19 resources ⬀

CDC's COVID-19 stress and coping information

What We Can Do To Promote Health Equity | CDC

Toolkit for People Experiencing Homelessness | CDC

## Previous Updates

As of June 7, 2021                                                                    ⌄

- Added considerations for developing a long term strategy related to COVID-19 prevention among people experiencing unsheltered homelessness

As of May 10, 2020                                                                    ⌄

- Revisions to document organization for clarity
- Description of "whole community" approach
- Clarification of outreach staff guidance
- Clarification of encampment guidance

Last Updated July 8, 2021

# EXHIBIT F

**MANDATORY WATER CONSERVATION.  <u>LEARN MORE
(HTTP://WWW.CITYOFPETALUMA.ORG/SAVEWATER)</u>.**

# STEAMER LANDING PARK

Steamer Landing Park, located on the McNear Peninsula in the center of town, is one of Petaluma's true "hidden gems". Established as a public park in 1996, Steamer Landing is made up of 9.7 acres and is best known as the location of several beloved/annual summertime events, including <u>"Rivertown Revival" (https://www.rivertownrevival.com/)</u> and the <u>"Transhumance Festival" (https://www.sassyandgrassy.com/)</u>. It's also considered the home of <u>"Friends of the Petaluma River (https://friendsofthepetalumariver.org/)"</u>, a non-profit that is focused on celebrating and maintaining the Petaluma River Watershed. The park's most recognizable feature is the David Yearsley River Heritage Center, a red barn (formerly a livery stable) that's both fascinating and hard to miss.

**Location: 6 Copeland Street, Petaluma, CA, 94952**







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN CALIFORNIA

SARAH GOSSAGE, JANINE NARETTO, MATHEW ERICKSON, KAMONCHANOK CHUMWANGWAPI, REILLY DRAKE, JOHNATHAN THOMAS, AND OTHERS SIMILARLY SITUATED,

        Plaintiffs

vs.

CITY OF PETALUMA, CITY MANAGER PEGGY FLYNN, CHIEF OF POLICE KEN SAVANO, MAYOR TERESA BARRETT, DIRECTOR OF PUBLIC WORKS BRIAN COCHRANE, DOES 1-100,

        Defendants

Case No.:

DECLARATION OF JANINE NARETTO

I, Janine Naretto, do declare as follows:

      I am 67 years old. I'm born and raised in Sonoma County. I've raised three kids here. I have been living at Steamer Landing Park for over a year, and have been uprooted by the city many times and have never been offered housing. The attached photo in Exhibit A is a true and correct photo of me taken on October 3rd, 2021.

      I need to use a wheel chair or walker for getting around because I have a herniated disc which makes it extremely painful and difficult to walk and move around. I have a hereditary cyst in my left hand that makes it very difficult to grasp anything. My right arm is also injured. I can't lift anything, or erect a tent, or carry water, and am immensely dependent on the care and support of my campmates for the provision of food, water, and all of the necessities of living. I also have fragile skin and easily bruise.

      I rely on my campmates here at Steamer Landing Park for the provision of food, water, and to conduct the activities of daily living. I need access to water and a bathroom, which are located here.

      I don't want to go to Mary Isaacs the shelter in Petaluma. When I go there I develop a kennel cough because of the poor air quality and circulation in the shelter.  The shelter also has a high rate of kicking people out without any kind of due process. When I am in there, I feel great anxiety that I could be kicked out at any time.

      I am not vaccinated against COVID-19 because I am afraid of the vaccine.

DECLARATION OF JANINE NARETTO - 1

1   My homestead at Steamer Landing consists of my tent and my car. I generally sleep in the tent because I

2   can stretch out the whole way when I go to bed and can only sleep at an angle in the seat of my car. However, my

3   car is where I can lock things up, keep my medications, essential paperwork, and other valuables as well as get out

4   of the elements into a locked place during emergencies.

5   Last time the city came they just destroyed my tent, bedding, and left me distraught. I need the city

6   to stop kicking me down like a can down the road. I just want housing and a cat. The constant harassment by the city

7   is wearing on my mental health.

8   I swear under the penalty of perjury that the foregoing is true and correct if called to testify would and

9   could testify competently thereto. Executed on October 5, 2021, in Petaluma, California.

11   _Janine Naretto_

12   JANINE NARETTO

28

DECLARATION OF JANINE NARETTO - 2

1   EXHIBIT A

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17



18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JANINE NARETTO - 3

1

2

UNITED STATES DISTRICT COURT

3

NORTHERN CALIFORNIA

4

| SARAH GOSSAGE, JANINE NARETTO, MATHEW ERICKSON, KAMONCHANOK CHUMWANGWAPI, REILLY DRAKE, JOHNATHAN THOMAS, AND OTHERS SIMILARLY SITUATED | Case No.: |

Plaintiffs,

DECLARATION OF JOHNATHAN THOMAS

5

6

vs.

7

8

CITY OF PETALUMA, CITY MANAGER PEGGY FLYNN, CHIEF OF POLICE KEN SAVANO, MAYOR TERESA BARRETT, DIRECTOR OF PUBLIC WORKS BRIAN COCHRANE, DOES 1-100,

9

10

Defendants

11

12

I, Johnathan Thomas Hold-Way, do declare as follows:

I am 49 years of age, and have been living at Steamer Landing Park in the City of Petaluma for about the

13

last year.

14

On September 30th, the city came and took my home – my van that I was sleeping in and kept all my

15

possessions in. They took all of my food, water containers, clothes, my jackets, my bedding, and my father's ashes

16

and my birth certificate, all without notice to me.

17

The City of Petaluma told me verbally that I had until October 6th until the car was going to be taken

18

because that was when they would clear everyone from Steamer Landing Park where my van was parked in the

19

parking lot, but I had no warning when it was taken a whole week earlier than October 6th. The guy who towed my

20

car had a gleeful, malicious look on his face when he took it from me against my protestations.

21

I now live in a tent right next to where my van was and after they took my van, I also lost my phone

22

because I didn't have any place to lock it up. I rely on the water spigot donated and the food that gets donated by

23

members of the public for survival. I swear under the penalty of perjury that the foregoing is true and correct if

24

called to testify would and could testify competently thereto. Executed on October __ 2021, in Petaluma, California.

25

26

27

_____

JOHNATHAN THOMAS

28

DECLARATION OF JOHNATHAN THOMAS  - 1

1

2

UNITED STATES DISTRICT COURT

3

NORTHERN CALIFORNIA

4

SARAH GOSSAGE, JANINE NARETTO, MATHEW ERICKSON, KAMONCHANOK CHUMWANGWAPI, REILLY DRAKE, JOHNATHAN THOMAS, AND OTHERS SIMILARLY SITUATED

Case No.:

5

6

vs.

DECLARATION OF SARAH GOSSAGE

7

CITY OF PETALUMA, CITY MANAGER PEGGY FLYNN, CHIEF OF POLICE KEN SAVANO, MAYOR TERESA BARRETT, DIRECTOR OF PUBLIC WORKS BRIAN COCHRANE, DOES 1-100

8

9

10

11

  I, Sarah Gossage do declare as follows:

12

  I am 41 years of age and I was born and raised in Sonoma County, and my dad is fifth generation Petaluma

13

raised. I have been living outside since my mom was murdered by her boyfriend in my bedroom when I was fifteen

14

years old. Since my mom died, I have been homeless except for an eight-year period after I gave birth to my only

15

son. The attached photo is a true and correct photo of myself taken in September 2021, at Steamer Landing Park.

16

  I'm a licensed security guard primarily working at concerts and events. I can't go to work right now

17

because I can't stay clean, and professional and don't have an address.

18

  My partner and I were caught up in the Tubbs fire, and lost our van that we and were at the FEMA shelter

19

for some time. Then we got a conversion van after which, I was living on a boat in Contra Costa County. We lost the

20

boat and came back to Sonoma County.

21

  I have been working at the Downtown Streets team for the last few months, though recently left because I

22

felt they were taking advantage of our situation, by promising to buy us showers but they did not bring the showers.

23

Instead they are using their money to buy new trucks. I just want to be able to shower every day and stay clean. At

24

most, I am able to shower a few times a month which is inhumane.

25

  I have been living at Steamer Landing for a year and a half. They kicked us out of the other place in

26

Steamer Landing by Duck Beach for their new private park, where the city sold the public land for a private park

27

that now excludes us.  Now we are forced out here to Steamer Landing Park and they want us out as well.

28

DECLARATION OF SARAH GOSSAGE - 1

1    The Mary Isaak shelter is not safe. Last time I was there it was 112 people packed into one room. Now its

2    sixty something but there is no privacy and you have to sign a contract that violates your rights to free speech. As

3    soon as we go in there they love to kick us out, holding shelter over our heads for any small slip up or violation of

4    even minor rules. They will kick you out for holding a sign asking for money while you are in the shelter, even if

5    you do it out on the street. Last time I went to the Mary Isaak Center, around January 2020, I got really sick with a

6    hacking cough. Everyone got really sick. I am not vaccinated from COVID 19 because I believe that I got COVID

7    while being at Mary Isaak prior to COVID-19 getting really big and since everyone is in one room it spreads

8    quickly. Everyone is forced to go to bed at 10 o'clock which doesn't suit me since I am an adult and cannot fall

9    asleep that early. It is especially bad because I am sexual assault survivor.

10    Especially if you're a woman, you get out in the boonies alone, we are like bait. We can get attacked. I

11    know people who camp out by themselves and you could get raped. It is safer to be part of a known community like

12    the one at Steamer Landing where women feel say because someone is watching out for them and their possessions.

13    I am upset that the City shut down the water on September 30, 2021 at Steamer Landing Park. The city's

14    actions are putting all of our lives in danger by forcing us to walk almost a half a mile just for some water, even with

15    the summer heat as intense as it has been. The city shut off the water a few days ago, so I can't bathe myself or wash

16    my clothes or do the things I need to get to a job interview. Instead, I have to go on trips to just get some water to do

17    those basic things. I had surgery three months ago for mastitis in my breast which means hygiene and showers is

18    very important to prevent infection.

19    The City of Petaluma also gave me tickets for camping too close to the water, which is the public property

20    part of Steamer Landing Park. So, they forced me to move my tent to the private side of the park. When I have asked

21    them, the cops don't know themselves which part of the park is private and white is public.

22    I swear under the penalty of perjury that the foregoing is true and correct if called to testify would and

23    could testify competently thereto. Executed on October 4 2021, in Petaluma, California.

24

25

26    SARAH GOSSAGE

27

28

DECLARATION OF SARAH GOSSAGE - 2

DECLARATION OF SARAH GOSSAGE - 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF SARAH GOSSAGE - 4

1

2                    UNITED STATES DISTRICT COURT

3                        NORTHERN CALIFORNIA

4
SARAH GOSSAGE, JANINE NARETTO, MATHEW          Case No.:
5    ERICKSON, KAMONCHANOK CHUMWANGWAPI,
REILLY DRAKE, JOHNATHAN THOMAS, AND
6    OTHERS SIMILARLY SITUATED,
                                                DECLARATION OF MATTHEW ERICKSON
7                    Plaintiffs,
vs.
8
CITY OF PETALUMA, CITY MANAGER PEGGY
9    FLYNN, CHIEF OF POLICE KEN SAVANO, MAYOR
TERESA BARRETT, DIRECTOR OF PUBLIC WORKS
10   BRIAN COCHRANE, DOES 1-100,

11                   Defendants

12
        I, Matt Erickson, do declare as follows:
13
        I am 46 years of age. I have been living outside for three years. I was 20th in my class in high
14
school and studied environmental engineering at Purdue University. I joined the U.S. air force, and then I had to
15
drop out because of complications due to military service. I was furniture for years afterwards, until a 11 years ago,
16
due to a car crash, my skull is now partially titanium, I have a lag bolt in my femur, and plate that goes down my
17
leg. A quarter of my cranium is made of titanium. I am severely disabled form the incident and it prevents me from
18
being going out to work often. I forgot my skill sets and my ability to make a living was undercut.
19
        I have no short-term memory, and I have trouble planning. It is as though I always live in the present. It is
20
impossible to deal with people or for me to hold down a normal job.
21
        I moved my trailer to Steamer Landing Park because I was being harassed by the City of Petaluma and they
22
police in every other part of the city. One of the police officers told me I should move to Steamer Landing from
23
where I was last living in my trailer under an overpass.
24
        I use my trailer as a place to store water and as a community center to give people water and food. Attached
25
are true and correct photos of my kitchen set up and cabinet.
26
        I swear under the penalty of perjury that the foregoing is true and correct if called to testify would and
27
could testify competently thereto. Executed on October ___ 2021, in Petaluma, California.
28
DECLARATION OF MATTHEW ERICKSON - 1

MATTHEW ERICKSON



DECLARATION OF MATTHEW ERICKSON - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF MATTHEW ERICKSON - 3



DECLARATION OF MATTHEW ERICKSON - 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF MATTHEW ERICKSON - 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF SARAH GOSSAGE - 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF SARAH GOSSAGE - 6





DECLARATION OF SARAH GOSSAGE - 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF SARAH GOSSAGE - 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



DECLARATION OF SARAH GOSSAGE - 9

1

2                            UNITED STATES DISTRICT COURT

3                               NORTHERN CALIFORNIA

4   SARAH GOSSAGE, JANINE NARETTO, MATHEW          Case No.:
    ERICKSON, KAMONCHANOK CHUMWANGWAPI,
5   REILLY DRAKE, JOHNATHAN THOMAS, AND
    OTHERS SIMILARLY SITUATED,
6                                                  DECLARATION OF EUGENE REILLY DRAKE
                   Plaintiffs,
7
    vs.
8
    CITY OF PETALUMA, CITY MANAGER PEGGY
9   FLYNN, CHIEF OF POLICE KEN SAVANO, MAYOR
    TERESA BARRETT, DIRECTOR OF PUBLIC WORKS
10  BRIAN COCHRANE, DOES 1-100,

11                 Defendants

12

13          I, Eugene Reilly Drake do declare as follows:

14          I am 29 years of age and recently have been displaced from Steamer Landing Park because of the threat

    from the police. I am working full time, forty hours a week, in a warehouse in Petaluma. I live in a tent with my

15  girlfriend. I am born and raised in Petaluma. I have been living outside for the last two years. The attached photos in

16  Exhibit A are true and correct photos of myself taken on October 3rd at Steamer Landing Park. The pictures show the

17  broken collarbone that causes me constant pain, spasms in my arm. It prevents me from lifting anything more 30 or

18  40 pounds at a time. I also have ring worm on my foot and am currently waiting for medicine to come and to take

19  care of it.

20          I now am living under a bridge in Petaluma but still need to come to Steamer Landing to get water, or get

21  food, and other necessities of survival. The heat takes a lot out of me. I need access to water. Because I don't have

22  anyone else around my camp. Every time I go to work now, I am afraid for the safety of my girlfriend because I

23  have to leave her alone while I work.

24          On September 30th, the city impounded my vehicle which was an immense loss. It was essential for my

25  survival and ability to get out of homelessness and get to and from work. They gave me no warning. No opportunity

26  to appeal or even a way to get my things out of my vehicle.

27

28

    DECLARATION OF EUGENE REILLY DRAKE - 1

1        The police towed my car without warning or evidence, alleging that the car was leaking oil even though I

2   have no evidence to believe that it was. I have had not opportunity to appeal.

3        My girlfriend and I are now at greater risk of being targeted for theft or assault because our tent is in a

4   place where we don't have anyone to watch our backs. I now have to walk even greater distances for food, water,

5   and other necessities of living. I also have no idea how long I can stay at my new location.

6        I swear under the penalty of perjury that the foregoing is true and correct if called to testify would

7   and could testify competently thereto. Executed on October 4 2021, in Petaluma, California.

8

9   _____

10  EUGENE REILLY DRAKE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF EUGENE REILLY DRAKE - 2

EXHIBIT A



DECLARATION OF EUGENE REILLY DRAKE - 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF EUGENE REILLY DRAKE - 4

1

2                              UNITED STATES DISTRICT COURT

3                                 NORTHERN CALIFORNIA

4   SARAH GOSSAGE, JANINE NARETTO, MATHEW          Case No.:
    ERICKSON, KAMONCHANOK CHUMWANGWAPI,
5   REILLY DRAKE, JOHNATHAN THOMAS, AND
    OTHERS SIMILARLY SITUATED,
6                                                   DECLARATION OF KAMONCHANOK
                    Plaintiffs,                     CHUMWANGWAPI
7
    vs.
8
    CITY OF PETALUMA, CITY MANAGER PEGGY
9   FLYNN, CHIEF OF POLICE KEN SAVANO, MAYOR
    TERESA BARRETT, DIRECTOR OF PUBLIC WORKS
10  BRIAN COCHRANE, DOES 1-100,

11                  Defendants

12
13          I, Kamonchanok Chumwangwapi do declare as follows:

14          I am 25 years of age and have been living at Steamer Landing Park. I worked as a in-home care aide,

    providing caregiving services to seniors and I lost significant work because the COVID 19 pandemic, greatly

15  reduced my working hours. I recently lost my apartment in San Francisco in July 2021. The apartment had a black

16  mold, and code enforcement came and told us we had to leave, and since then I have had to live outside because I

17  don't have the income to rent another place to live. I can't get a job now because I don't have an address.

18          I have left Steamer Landing with my boyfriend because of threat of eviction. However, I still have to come

19  to the park to get water and other necessities for survival. I am afraid at the new campground, because it's just our

20  tent alone. My boyfriend works during the day, and I am afraid that when he is gone, our camp can be evicted at any

21  time by the City of Petaluma. I feel less safe, because I don't know anyone in the new spot.

22          I suffer from gout, which makes it very difficult to walk long distances so travelling from the new camp to

23  Steamer Landing for a bathroom and water is very hard.

24          On September 30th, the police took my boyfriend's car and I no longer have somewhere safe to

25  lock my things.

26          I swear under the penalty of perjury that the foregoing is true and correct if called to testify would and

27  could testify competently thereto. Executed on October 4 2021, in Petaluma, California.

28
    DECLARATION OF KAMONCHANOK CHUMWANGWAPI - 1

1

2

3 KAMONCHANOK CHUMWANGWAPI

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF KAMONCHANOK CHUMWANGWAPI - 2